UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JASON LEOPOLD**, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF JUSTICE**,<br><br>    Defendant. | Case No. 1:20-cv-03651 (TNM) |

## MEMORANDUM OPINION

In 2020, a media organization and one of its then-employees sued the Department of Justice. They alleged deficiencies in the agency's response to a Freedom of Information Act request concerning the 2020 presidential election. The Department produced hundreds of documents but, to Plaintiffs' chagrin, withheld portions of the relevant material. The Department says the material is exempt from disclosure because it is deliberative and predecisional. More, one section allegedly contains law enforcement techniques and procedures. So the Department moves for summary judgment. But Plaintiffs dispute these characterizations and respond with their own cross-motion for summary judgment.

The Court finds that FOIA permits the Department's withholdings, save for one. Most of the records Plaintiffs seek would reveal the Department's internal dialogue as it vetted decisions. While FOIA mandates transparency, it does not require exposing candid agency discussions when doing so would harm the agency's future deliberations. The Department's motion for summary judgment thus will be granted in part and denied in part. Plaintiffs' cross-motion for summary judgment will also be granted in part and denied in part.

## I.

Shortly after the 2020 presidential election, Jason Leopold and Buzzfeed, Inc., (collectively, "Buzzfeed") filed a FOIA request with the Department. They sought records "sent to or from the Attorney General and several senior Department officials and offices referencing any voting irregularities and related issues in the 2020 election." Pls.' Cross-Mot. for Summ. J., ECF No. 36, at 1. The Department advised Buzzfeed that it might take upwards of six months to collect and vet the records because of the "unusual circumstances" of the request. Compl. Ex. B, ECF No.1-2, at 1; *see also* Compl. Ex D, ECF No. 1-4, at 1. Buzzfeed sued here a few days later. *See* Compl., ECF No. 1, at 4.

Over the next four years, the Department identified around 720 pages of responsive material and produced around 360 pages either in full or in part. *See* Decl. of Vanessa R. Brinkmann ("Brinkmann Decl."), ECF No. 34-2, ¶¶ 8–10. It withheld the rest under various FOIA exemptions. *Id.* As litigation progressed, the parties narrowed their disagreements and now only dispute partial withholdings in five documents. *See Vaughn* Index, ECF No. 34-10, at Bates Nos. 60–62, 126–28, 159–65, 173–75, 498, 488–89. These documents are: (1) a guide to help agency staff respond to election-related inquiries from Congress; (2) an email from a Department official discussing possible government enforcement actions under the Voting Rights Act; (3) an assessment by the same Department official of states' compliance with the Voting Rights Act; (4) draft answers from the Department of Homeland Security in response to questions from Congress; and (5) the Department's comments and feedback on those draft answers. *See id.* For each of these documents, the Department withheld material under FOIA Exemption 5. One withholding also included Exemption 7(E) as another rationale.

The Department moved for summary judgment and Buzzfeed responded with a cross-motion for summary judgment. These cross-motions for summary judgment are now ripe. The Court has subject-matter jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

## II.

Courts can typically resolve FOIA cases on summary judgment. *See Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment is appropriate when the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Agencies moving for summary judgment in FOIA cases must show that the contested records "are exempt from disclosure under FOIA." *Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018) (cleaned up). Agencies usually rely on declarations that "describe[] the justifications for withholding the information with specific detail, demonstrate[] that the information withheld logically falls within the claimed exemption, and [are] not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Id.* This burden remains with the agency even if a plaintiff cross-moves for summary judgment. *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C. Cir. 1999).

FOIA reflects a legislative recognition that the "full and frank exchange of ideas on legal or policy matters would be impossible" if agencies "were forced to operate in a fishbowl." *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005) (cleaned up). Yet over the years, Congress grew concerned that agencies were overusing FOIA's carve-outs—Exemption 5, especially—so it added another requirement for withholding. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021).

Now, an agency withholding records under a FOIA exemption must also show that releasing the records would cause "foreseeable harm to an interest that the exemption protects." *Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024). The foreseeable harm requirement is "distinct" from and "consecutive" to the threshold applicability of a FOIA exemption. *Id.* The agency "must provide a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede the interests protected by a FOIA exemption." *Id.* (cleaned up). "[B]oilerplate and generic assertions" will not do. *Id.* That said, the foreseeable harm consideration works differently in some non-deliberative process exemptions that by their nature require a demonstration of risk in disclosure. *See Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120, 127–28 (D.D.C. 2021).

More, even when an agency withholds a record, it must still release "[a]ny reasonably segregable portion of [the] record" that is not covered by an exemption. *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(b)). Segregability has its limits though, and otherwise releasable material may be withheld if it is "inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Agencies determine segregability by reviewing content "line-by-line." *Porup v. Cent. Intel. Agency*, 997 F.3d 1224, 1239 (D.C. Cir. 2021).

After such a line-by-line review, an agency is "entitled to a presumption that [it] complied with [its] obligation." *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007). District courts must make "specific findings" on segregability before "approving the application of a FOIA exemption." *Stolt-Nielsen*, 534 F.3d at 734.

Thus, the Department must show that the withheld content is covered by a FOIA exemption or otherwise not segregable, and that releasing the material would cause foreseeable harm.

### III.

### A.

First up is an Office of Legislative Affairs ("OLA") document titled "OLA 2020 ELECTION TRIAGE" ("Triage Document"). Brinkmann Decl. ¶ 17. It "outlines potential election day issues" and lists step-by-step triage instructions "for OLA staff" to follow when handling inquiries from Members of Congress on election day. *Id.*; *see generally* Def. Ex. F, ECF No. 34-9. The document includes a section with hypothetical questions and answers, as well as "proposed or anticipated tasks expected to be performed by OLA staff." Brinkmann Decl. ¶ 17. Senior OLA officials wrote the Triage Document, including the "OLA Chief of Staff, two OLA Senior Counsel, and an OLA Counsel, with the assistance of an OLA Legislative Assistant." *Id.* After preparing it, the senior officials sent it to the head of OLA, describing it as the agency's "primary election materials." Def. Ex. D, ECF No. 34-6, at Bates Nos. 158. OLA did not end up receiving any congressional inquiries on election day, so the Department never used the Triage Document. Brinkmann Decl. ¶ 17.

The Department released a heavily redacted version of the document to Buzzfeed. It justified most of the redactions under the deliberative process privilege encapsulated in FOIA Exemption 5. *See* Def. Ex. F, at 6–15. In explaining its rationale, the Department frames the Triage Document as a set of predecisional and deliberative "talking points." Def.'s Reply, ECF No. 40, at 3. Having reviewed the Triage Document in camera, *see* ECF No. 42, the Court finds it is neither predecisional nor deliberative. Rather, it is a final set of instructions promulgated by

5

office leadership for staff to follow when responding to congressional inquiries. So the Department must release the portions of the Triage Document it withheld solely under Exemption 5.

Exemption 5 lets agencies shield records covered by "one of the recognized evidentiary or discovery privileges." *Pub. Citizen, Inc. v. Off. of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010); *see also* 5 U.S.C. § 552(b)(5). This includes the deliberative process privilege for documents that are predecisional and deliberative.[1] *Pub. Citizen*, 598 F.3d at 874. "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021).

But "an agency's application of a policy to guide further decision-making does not render the policy itself predecisional." *Pub. Citizen*, 598 F.3d at 875. Nor is a document predecisional simply because it uses a "hypothetical[] fact pattern" to "discuss established policies and decisions." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).

Talking points sent "from a subordinate to a superior official [are] more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining . . . a decision already made." *Id.* When compiled for a senior official, talking points are usually predecisional because the official "may elect to use all, some, or none of the talking points prepared for her." *Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 173 (D.D.C. 2018). Yet the same is not necessarily true of talking points

---

[1] The records must also be "inter-agency or intra-agency" records, but Buzzfeed does not dispute that requirement. Pls.' Cross-Mot. for Summ. J. at 3 n.4.

created by senior officials for use by subordinates because subordinates lack "authority to depart from their content." *Jud. Watch, Inc. v. U.S. Dep't of State*, 349 F. Supp. 3d 1, 9 (D.D.C. 2018).

The Department maintains that Exemption 5 covers the Triage Document because: (1) it includes suggested answers to potential questions that "reflect[] the deliberative process of OLA staff about how best to respond to hypothetical inquiries from Congress"; and (2) its creation preceded the agency's final decision—meaning the "real time" response from OLA staff to "actual inquires from Congress." Def.'s Reply at 3–4.

Take these arguments in turn. First, the Triage Document's inclusion of hypothetical questions and answers does not automatically make it predecisional or deliberative. *See Coastal States*, 617 F.2d at 868. Rather, the conjectured back-and-forth was part of a finalized, top-down directive to help OLA staff field questions on election day. *See Pub. Citizen*, 598 F.3d at 875. So had OLA staff looked to the hypotheticals and suggested answers, they would have been simply following protocols implemented by their leadership. The hypotheticals sent down the chain merely served to "embody or explain" the agency's *existing* positions rather than imbue OLA staff with discretion to decide *final* agency positions. *U.S. Fish & Wildlife Serv.*, 592 U.S. at 263.

The Department does little to counter this characterization. It does not assert that OLA staff had discretion to disregard the Triage Document. Instead, it argues that the document was deliberative because it contains what the Department characterizes as "proposed or suggested" answers rather than a fixed script. *See, e.g.*, Brinkmann Decl. ¶ 17. In other words, because the staff was not force-fed static lines to recite, responding to congressional inquiries would have necessarily involved deliberation.

7

The Court sees it differently. What the Department frames as "proposed or suggested" answers read very much like a fixed script with no indication they are mere suggestions. Besides, allowing OLA staff some linguistic discretion rather than mandating verbatim recitation is hardly the same as giving OLA staff authority to disregard the Triage Document's content. Had someone from Congress made an inquiry, OLA staff would not have independently decided the agency's position on the spot. They would have followed the final guidance and conveyed the pre-vetted content laid out in the Triage Document. So contrary to the Department's assertions, the document did not invite OLA staff to engage in autonomous deliberation.

This lack of discretion by OLA staff also undermines the Department's second point. The Department says the relevant final decision was the actual *responses* to inquiries, not the creation of the Triage Document. That may often be true when subordinates prepare talking points for senior officials. But it does not follow that the same is true when senior officials send nondiscretionary instructions—including talking points—to others. *See Coastal States*, 617 F.2d at 868. Indeed, it is telling that the Department has not identified a single case applying Exemption 5 to talking points created by superiors and used by subordinates. *See* Def.'s Mot. for Summ. J., ECF No. 34-1, at 9–10; Def.'s Reply at 2–4.

Instead, the Department relies on cases involving talking points prepared for senior officials with no obligation to use them. *See* Def.'s Mot. for Summ. J. at 9–10; *see also Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 176 (D.D.C. 2018) (talking points were "advice for high-level officials" in the executive branch); *Am. Ctr. for Law & Just. v. U.S. Dep't of Just.*, 334 F. Supp. 3d 13, 21 (D.D.C. 2018) ("[T]hese talking points are no more than 'advice from subordinates' to senior officials, who may or may not rely upon them."). The Department has thus not offered any compelling reason why the Court should treat the Triage

Document like traditional predecisional talking points prepared for a senior official, rather than seeing it akin to an agency "policy to guide further decision-making" by subordinates. *Pub. Citizen*, 598 F.3d at 875.

In any event, disclosing the Department's redactions risks no foreseeable harm to the agency. The Department must explain "how disclosure would—not could—adversely impair" the deliberative process. *Reps. Comm. for Freedom v. FBI*, 3 F.4th at 369–70 (cleaned up). The Department cautions that release would dampen its "robust internal" deliberations and impede its ability to craft "accurate, informed, and thoroughly vetted" responses to congressional inquiries. Def.'s Mot. for Summ. J. at 12. Yet precisely how remains a mystery. The Department withheld its draft iterations and revisions to the Triage Document, so its internal deliberations remain shielded. *See* Def.'s Mot. for Summ. J. at 10–11. And the final version contains pre-vetted information the Department considered suitable for release to Members of Congress. The Department does not explain how exposing these previously cleared-for-release responses would now cause harm. At best, these inchoate concerns are "boilerplate and generic assertions." *Leopold*, 94 F.4th at 37. FOIA requires more.

In sum, Exemption 5 covers talking points when they are predecisional and deliberative, but the talking points here are neither. They are instead part of the final instructions senior OLA officials prepared for use by staff when conveying predetermined agency positions. And even if Exemption 5 did apply, the Department has not shown foreseeable harm.

### B.

### 1.

Next is an email from John Daukas, the Principal Deputy Assistant Attorney General in the Department's Civil Rights Division ("CRT") to members of CRT senior leadership. Suppl.

9

Decl. of Kilian Kagle (Kagle Suppl. Decl.), ECF No. 39-1, ¶ 3.  It includes Daukas's "discussion and analysis" of "potential remedies to alleged violations of . . . the Voting Rights Act of 1965 [] in the 2020 presidential election."  *Id.*  Part of the email describes "a narrative decision tree [with] the steps and their prerequisites justifying the deployment of election monitors to polling places."  *Id.* ¶ 6.  It also lays out CRT's recommendation on whether the agency should deploy federal observers.  Brinkmann Decl. ¶ 27.  The Department redacted the entire body of the email, relying again on Exemption 5's deliberative process privilege.  *See* Def. Ex. D, at Bates No. 498.  As additional justification, the Department also invoked Exemption 7(E)'s protection for law enforcement techniques and procedures.  Kagle Suppl. Decl. ¶ 3.

Consider first Exemption 5.  Buzzfeed says the discussion of "legal authority and factors" is segregable and subject to disclosure because it is just the agency's preexisting policy.  Alternatively, Buzzfeed contends it is purely factual content and likewise segregable.  Pls.' Reply, ECF No. 41, at 3.  The Court disagrees.

If a document "does nothing more than explain an existing policy," Exemption 5 offers no protection.  *Pub. Citizen*, 598 F.3d at 876.  But as with factual material, discussions of policy may be withheld when "inextricably intertwined with exempt portions" of the record.  *Mead Data Cent.*, 566 F.2d at 260.

The email does more than just recite or "explain an existing policy."  *Pub. Citizen*, 598 F.3d at 876.  It contains Daukas's analysis and recommendations to senior leadership on potential agency enforcement actions.  True, this implicates existing policy.  But the Department confirms that discussion of these legal authorities and factors is bundled into Daukas's overall recommendation.  It is not an anodyne explanation of policy.  *See* Kagle Suppl. Decl. ¶ 8.  So

Daukas's discussion of the pertinent law is "a direct part of the deliberative process." *Pub. Citizen*, 598 F.3d at 876 (cleaned up).

This also overpowers Buzzfeed's insistence that the legal background is merely factual material. Even if the legal authorities and factors are purely factual matters, the Department concluded after a line-by-line review that the withheld material is inherently intertwined with "the deliberative analysis and cannot be released without revealing the agency's deliberative process." Kagle Suppl. Decl. ¶ 8[2]; *see also Mead Data Cent.*, 566 F.2d at 260. The Court agrees and finds that this information is not reasonably segregable.

But that does not end the inquiry. Buzzfeed also challenges the Department's use of Exemption 7(E) and argues that: (1) "factors" and "levels of proof to establish" a Voting Rights Act violation do not qualify as law enforcement "techniques and procedures"; and (2) the Department has not shown that release would cause harm. Pls.' Reply at 9–10.

As relevant here, Exemption 7(E) protects "records or information compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The agency must "demonstrate logically how the release of the requested information might create" such a risk of circumvention. *Blackwell v. FBI,* 646 F.3d 37, 42 (D.C. Cir. 2011).

The exemption prevents FOIA releases from "expos[ing] . . . vulnerabilities to potential criminals." *Id.* It allows agencies to withhold "facts about [law enforcement] techniques or their usefulness that are not generally known to the public" or information that would "reduce the

---

[2] Buzzfeed attacks Kagle's declaration because it lacks reference to a line-by-line review. Pls.' Reply at 4. But Brinkmann's declaration discusses the agency's line-by-line review of the email. *See* Brinkmann Decl. ¶ 31.

11

effectiveness of such techniques." *Broward Bulldog, Inc. v. U.S. Dep't of Just.*, 939 F.3d 1164, 1191 (11th Cir. 2019). Merely reciting statutory language is not enough though: "the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 746 F.3d 1082, 1102 (D.C. Cir. 2014). As with other FOIA exemptions, the agency must also show that release would cause reasonably foreseeable harm. *See Leopold*, 94 F.4th at 37. That said, Exemption 7(E) by its own terms goes a long way towards demonstrating a risk of foreseeable harm. *Accord Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d at 128.

Agencies previously only had to show with that release "could" cause harm, but the FOIA Improvement Act of 2016 increased the standard to "would" cause harm. *Leopold*, 94 F.4th at 36. The Department insists the standard remains "could" cause harm because the D.C. Circuit "has continued to apply its pre-FOIA Improvement Act caselaw in the Exemption 7(E) context" rather than changing the standard. Def.'s Reply at 12 (quoting *Reps. Comm. for Freedom of Press v. FBI*, 548 F. Supp. 3d 185, 196 (D.D.C. 2021)). In any event, the Department meets its burden under either standard.

To start, the Department has shown that Exemption 7(E) applies. Daukas's discussion of the factors and level of proof is part of "a narrative decision tree [that lists] the steps and their prerequisites justifying the deployment of election monitors to polling places." Kagle Suppl. Decl. ¶ 6. The factors and levels of proof are part of the process CRT implements when making the decision to initiate a law enforcement action. This "decision matrix" "is not publicly known," *id.*, so releasing it would reveal the procedure—the algorithm—that CRT employs when triggering enforcement.

Buzzfeed urges the Court to limit the definition of "techniques" and "procedures" to concrete "actions." And it argues that "laws are not actions." Pls.' Cross-Mot. for Summ. J. at 13. But Buzzfeed does not identify any cases that adopt this definition. More, at least one circuit has concluded otherwise, finding that techniques and procedures include not just "law enforcement methods" but also "the triggers for the application of methods." *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 330 (2d Cir. 2022). This Court also declines Buzzfeed's invitation to read techniques and procedures so narrowly. Even if the Court did follow Buzzfeed's definitional framework, the factors and legal authorities would still be exempt from disclosure because they are "inextricably intertwined with exempt portions" of Daukas's analysis. *Mead Data Cent.*, 566 F.2d at 260.

The Department has also shown that releasing this material would risk circumvention of the law. As its supplemental declaration notes, "[m]any aspects of DOJ's [Voting Rights Act] enforcement are assertively contested" and there are "many opponents actively seeking ways to prevent the agency from enforcing" the Act. Kagle Suppl. Decl. ¶ 7. Listing "those circumstances by which the very law enforcement technique discussed can be undone or be ineligible" thus poses a threat of "undermining the underlying technique and process and risk[ing] circumvention of the law." *Id.* ¶¶ 6–7.

These same concerns make it "reasonably foreseeable" that disclosure "would . . . jeopardize the Department's ability to implement" its federal monitor program for elections by "expos[ing] significant portions of the sensitive law enforcement process." Kagle Suppl. Decl. ¶ 7. Revealing information on the non-public Voting Rights Act enforcement decision tree and the circumstances in which enforcement techniques "can be undone or be ineligible" when

13

opponents are "actively seeking ways to prevent," *id.* ¶¶ 6–7, agency enforcement would surely "reduce the effectiveness of such techniques." *Broward Bulldog*, 939 F.3d at 1191.

In sum, the Department has met its burden by demonstrating that Exemption 7(E) applies to the withheld material and that release would cause foreseeable harm.

### 2.

Daukas prepared a second document for "the Department's Senior Leadership Offices" that analyzed "the factors that CRT considers when assessing compliance with the Voting Rights Act," and gave "CRT's opinion as to the adequacy of certain state list maintenance programs and rationale therefore." Brinkmann Decl. ¶ 27; *see also* Def. Ex F at 16–17. He discusses the "CRT Voting Section's monitoring of efforts to update voter registration rolls nationally since 2017, and specifically the efforts of the State of Michigan." Kagle Suppl. Decl. ¶ 9. This includes an "interim assessment in November 2020 of Michigan's voter list maintenance practices as part of an investigation that remain[ed] open as of" June 2024. Kagle Suppl. Decl. ¶ 11. The Department redacted portions of the document under Exemption 5. Buzzfeed maintains that the Department did not meet its burden because it failed to identify "the decision or decision-making process" the material implicates. Pls.' Cross-Mot. for Summ. J. at 8. Buzzfeed also says some of the withheld information is purely factual. *Id.* Not so.

To be sure, the Department has "the burden of establishing what deliberative process is involved, and the role played by the documents in . . . that process." *Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 995 F.3d 1014, 1021 (D.C. Cir. 2021) (quoting *Coastal States*, 617 F.2d at 868). But the Department satisfied this burden with its declarations. It identifies the relevant decision-making processes as "the adequacy of certain state list maintenance programs" and whether Voting Rights Act enforcement actions were warranted. Brinkmann Decl. ¶ 27; *see*

14

*also* Kagle Suppl. Decl. ¶ 11. More, the Department conducted a line-by-line review and concluded any factual material in Daukas's "analysis and propose[d] suggestions and recommendations" is not reasonably segregable. Brinkmann Decl. ¶¶ 29, 30. Other than reiterating that the material is factual, *see* Pls.' Reply at 4–6, Buzzfeed offers nothing to overcome the "presumption that [the Department] complied with [its] obligation" to release reasonably segregable material. *Boyd*, 475 F.3d at 391. The Department has met its burden by showing that Exemption 5 applies and that any factual material is not reasonably segregable.

The Department also established that releasing the material would cause foreseeable harm through its declarations. *See* Def.'s Mot. for Summ. J. at 13–14 (quoting Brinkmann Decl. ¶ 25). Buzzfeed does not contend otherwise. *See* Pls.' Cross-Mot. for Summ. J. at 7–8.

## C.

Finally, the parties spar over draft answers the Department of Homeland Security created in response to an inquiry from the congressional Homeland Security and Governmental Affairs Committee. Brinkmann Decl. ¶ 42. After drafting the answers, DHS sent them to the Department for feedback. The Department offered comments and substantive feedback on the answers, though DHS never ended up sending its answers to Congress. Decl. of Jonathan M. Breyan ("Breyan Decl."), ECF No. 39-2, ¶ 8. The Department used Exemption 5 to withhold parts of DHS's draft answers and the Department's feedback, claiming release would cause public confusion and chill interagency coordination. Def.'s Reply at 8–10. Buzzfeed does not dispute Exemption 5's applicability and instead contends that the Department has not shown foreseeable harm. *See* Pls.' Reply at 6.

**1.**

Consider first DHS's draft answers. While the Department's vague concern over public confusion is uncompelling, it persuasively explains how release will curb interagency review.

Public "misperception of agency positions" can sometimes damage "the quality of agency decisions." *Pavement Coatings*, 995 F.3d at 1022 (cleaned up). For instance, "premature disclosure" of draft policies may cause confusion over an agency's actual position. *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017). So too can records "suggesting" an agency relied on certain "reasons and rationales" for a decision when in fact it did not. *Id.* (cleaned up). But as with any withholding, an agency must still provide a "concrete demonstration" of how release would "*actually* impede the interests protected" by FOIA. *Leopold*, 94 F.4th at 37.

The Department's concern over public confusion runs headlong into the insufficiency of "boilerplate and generic assertions." *Leopold*, 94 F.4th at 37. At most, it frets that release "would cause public confusion by disclosing information which never reflected finalized agency responses or policies." Breyan Decl. ¶ 8. But this argument just restates the rule without breathing analytical life into it. How the material would confuse the public, or even *what* the public would be confused about remain unanswered. This spectral concern is "*precisely* the kind of boilerplate, unparticularized, and hypothesized assertion of harm" that is insufficient. *Reps. Comm. for Freedom v. FBI*, 3 F.4th at 371.

The Department fares better when explaining how release will harm the interagency review process. It says agencies will hesitate to collaborate if doing so increases the chances their drafts will be released to the public. *See* Def.'s Reply at 9; *see also* Brinkmann Decl. ¶ 45. Buzzfeed retorts that DHS would have created a draft whether or not the agency sent it out for

review.  Pls.'s Reply at 7.  So, Buzzfeed reasons, interagency review is not harmed by releasing a draft that would have been created either way and that might theoretically be releasable through a FOIA request to DHS.  *Id.*

But "Exemption 5 does not distinguish between inter-agency and intra-agency memoranda."  *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975).  Rather, "[t]he deliberative process can—as it did here—span between two different agencies."  *Hunton & Williams LLP v. U.S. Env't Prot. Agency*, 248 F. Supp. 3d 220, 247 (D.D.C. 2017); *see also CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161 (D.C. Cir. 1987) (recognizing that Exemption 5 can extend even to documents shared between agencies and non-agency consultants).  Because Exemption 5 protects documents sent between agencies as part of the deliberative process, any impediment to multi-agency review is "harm to an interest that the exemption protects."  *Leopold*, 94 F.4th at 37.  Buzzfeed cannot seek a DHS document through a suit against another agency and then ask the Court to forget that this agency only has the document because of inter-agency review.

Forcing the Department to release a DHS draft sent for feedback would chill interagency review.  If a draft is releasable just because one agency sends it to another for feedback, it follows that agencies will become "more circumspect in sharing proposed Congressional responses for interagency coordination."  Breyan Decl. ¶ 8.  And this reticence to share draft communications to Congress would "hamper the ability of agencies"—including the Department—to ensure "that the various equities called for in responses to Congressional inquiries are adequately addressed by the appropriate agency and agency components."  Brinkmann Decl. ¶ 45.

So "in the specific context of" agency responses to congressional inquiries, the Department has established that releasing the DHS draft would "actually impede . . . deliberations" by chilling interagency collaboration and feedback. *Reps. Comm. for Freedom v. FBI*, 3 F.4th at 370.

2.

As for the Department's feedback on the draft, the agency fears release "would harm with reasonable foreseeability the [the Department's] predecisional, deliberative decisionmaking process." Brinkmann Decl. ¶ 46. Specifically, it would hinder the agency's ability "to engage in the interagency legislative review process without constraint" by making its personnel "less inclined to share their thoughtful analysis and recommendations in response to interagency review" requests. *Id.* ¶ 45; *see also* Breyan Decl. ¶ 8. The Court agrees and is unpersuaded by Buzzfeed's assertion that the concern is conclusory and lacks support. Pls.' Reply at 7.

The Department submitted multiple sworn declarations discussing this concern. The declarations properly "focused on the information at issue . . . [and] concluded that disclosure of th[e] information would chill" candid feedback, which "is exactly what the privilege seeks to prevent." *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (cleaned up). The Court will not second-guess these declarations. *See Knight First Amend. Inst.*, 30 F.4th at 329 ("On summary judgment, we accept an agency's affidavits as true unless they are controverted by either contrary evidence in the record or by evidence of agency bad faith." (cleaned up)). The Department has met its burden to show reasonably foreseeable harm from releasing the DHS draft and its comments.

## IV.

The Court has also considered segregability. Based on the Department's declarations and briefing, the Court finds that it conducted a line-by-line review of each record and released all reasonably segregable portions. *Accord Callimachi v. FBI*, 583 F. Supp. 3d 70, 93 (D.D.C. 2022) (noting challenger must provide a "quantum of evidence" to overcome presumption that agency complied with its obligation to disclose reasonably segregable material). The Department must release the parts of OLA's Election Triage Document that it withheld solely under Exemption 5, but FOIA permits its other withholdings.

For these reasons, the Department's Motion for Summary Judgment will be granted in part and denied in part. Buzzfeed's Cross-Motion for Summary Judgment will also be granted in part and denied in part. A separate order will issue today.

Dated: December 18, 2024                           TREVOR N. McFADDEN
                                                   United States District Judge